ADAMS & WESTLAKE MANUF'G Co. v. RATHBONE and others.[1]

*(Circuit Court, N. D. Illinois. January 11, 1886.)*

1. PATENTS FOR INVENTIONS—DEFENSE OF WANT OF PATENTABILITY.

It is quite common for those who are appropriating the result of another's labor or inventive genius to attempt to belittle the device so appropriated, and insist that it required no exercise of the inventive faculty to produce it; but where the device went into general use upon the issuing of the patent, and marked the point between failure and success, the invention is established.

2. SAME—NOVELTY—OIL-STOVES.

A patent for an oil-stove having the chimneys fixed between two plates, so as to make the single structure readily movable as a whole, to facilitate the placing of the chimneys over the burner for the purpose of cooking or heating, or removing them for cleaning, trimming, or filling the lamp, the oil-pot forming the base of the stove, and the chimney being removable, is not anticipated by a gas and oil-stove having an upper and lower plate, with the oil-pot slid in between them.

3. SAME—PRIOR USE—EVIDENCE OF.

It is sufficient, to defeat a patent, to show that the device covered by it has been in public use or on sale for more than two years prior to the application for a patent; but the party asserting such a defense assumes the burden of proof, and is bound to sustain it by clear and convincing testimony.

4. SAME—INSUFFICIENT EVIDENCE OF PRIOR USE.

Proof as to the use of alleged prior devices, resting wholly in the recollection of persons who claimed to have seen or used them about 20 years before, and where none of such devices were produced, is too unreliable to form a safe basis for judicial action.

5. SAME—ABANDONED EXPERIMENTS.

Where it was not shown that more than one of each of the alleged prior devices was ever made, and these were not produced, but were testified to from memory 20 years after, *held,* that these instances of use were to be properly classified as abandoned experiments.

6. SAME—MITCHELL PATENT, No. 96,249, OF OCTOBER 26, 1869—KEROSENE STOVES.

The first claim of this patent is infringed by oil-stoves having top and bottom plates with chimneys held between them; and although such stoves have a drum or casing surrounding the chimneys, this is a mere addition, and does not change the combination covered by this claim.

7. SAME.

The second claim of this patent, in view of the prior state of the art, must be limited to projections cast or raised upon or as a part of the surface of the plate for holding the cooking utensils, and such claim was not infringed by the oil-stoves of defendants involved in this suit.

In Equity.

*Coburn & Thacher,* for complainant.

*Offield, Towle & Phelps* and *M. D. Leggett,* for defendants.

BLODGETT, J. This is a bill to restrain the alleged infringement of letters patent No. 96,249, granted to R. B. Mitchell, October 26,

---

[1] Reported by Charles C. Linthicum, Esq., of the Chicago bar.

1869, for "an improvement in kerosene stoves," and for an accounting. The chief feature of the invention covered by this patent consists in holding the chimneys between upper and lower plates, so that the lower plate rests directly over the burners, and in fact, as a general rule in construction, contains the cones of the burners of the kerosene lamps, while the upper plate furnishes facilities for holding the cooking utensils. The upper plate also contains projections extending upward, which sustain the cooking vessels above the tops of the chimneys, so as to allow the heated air and products of combustion to pass out from under the cooking vessel without obstruction. The patent contains four claims, but only the first two are in controversy in this case, which are as follows: .

"(1) The combination of the chimneys, J, and the plates, D and K, when constructed and arranged in a kerosene stove, substantially as and for the purposes specified and shown. (2) The projections, O, on the upper surface of the plate, K, in combination with the chimneys, J, in a kerosene stove, when constructed and arranged substantially as and for the purposes specified."

In the specifications and drawings, the plate, D, is the bottom or lower plate of the chimney section, as it is called, and the plate, K, is the upper plate or top of the section.

The defenses relied upon are: (1) That the patent sued upon shows no proper subject-matter of invention or patentability; (2) that the patent is void for want of novelty; (3) that the device covered by the patent had been in public use for such time before the patent was applied for as to make the patent void; (4) that the defendants do not infringe.

As to the first defense. It is quite common for those who are appropriating the results of another's labor or inventive genius to attempt to belittle the device so appropriated, and insist that it required no exercise of the inventive faculty to produce it; but when we consider the state of the art at the time this inventor entered the field, as shown by the proofs in this case, it is quite evident that no one had hit upon the Mitchell idea of fastening the chimneys between the two plates, and utilizing the upper plate as a stand on which the cooking utensils were to be placed; and when the Mitchell patent had instructed the world as to the especial adaptation of this arrangement to the purposes of oil-stoves, it seems to have gone into general use. That it was new when Mitchell entered the field seems to me to be abundantly and clearly shown by the proof in this case. That it is useful the defendants can hardly be heard to deny so long as they appropriate and use it in substantially the exact form in which Mitchell produced and describes it. It may seem now to have been but a small matter to have fastened the chimneys between these two plates, but I gather from the proof that doing it marks the point between failure and success in this class of devices.

As to the second point. That the patent is void for want of novelty

a very large number of anticipatory devices are put into the record; but, after a careful study of them, I do not find in the proof anything which can be fairly said to exhibit the peculiar form of construction shown in this patent. What Mitchell did was to fix his chimney between the two plates, so as to make the single structure readily movable as a whole to facilitate the placing of the chimneys over the burner for the purpose of cooking or heating, or removing them for cleaning, trimming, or filling the lamp. That he secured a compact and readily adjustable apparatus for utilizing coal-oil as a cooking fuel is abundantly shown by the proof in this case; and while some of the older devices appearing in the testimony show upper and lower plates, or top and bottom plates, in none of them do I find anything which suggests the Mitchell device, or gives direction how to make it. It is a part of our common knowledge that the top and bottom plates of the ordinary cooking or box stove had been used for many years prior to this patent; but that does not, it seems to me, defeat the arrangement which Mitchell contrived and applied to a coal-oil stove. The difference between this and the McDougal gas and oil stove, which is much relied upon by the defense, is that McDougal's bottom plate is below the oil-pot, and the oil-pot, when an oil-lamp was used, had to be slid into the stove between the upper and lower plates, while, in Mitchell's device, the oil-pot forms the base of the structure, and the chimneys are removable therefrom.

The defense as to prior use, for a time sufficient to defeat the patent, has involved the examination of an immense mass of conflicting, and what, at first, seemed wholly irreconcilable, testimony. The instances of prior use relied upon are the Rogers stove, used at South Boston in 1861; the Robinson stove, used in Boston in 1863; what is called "The Condon Exhibit," said to have been used at Chicago in 1865; and the "Stevens & Thorpe Exhibit," said to have been produced and brought into use in Chicago in 1866. It is sufficient, to defeat a patent, to show that the device covered by it has been in public use or on sale for more than two years prior to the application for a patent; but the party asserting such a defense assumes the burden of proof, and is bound to sustain it by clear and convincing testimony. "Prior use must be proved beyond any fair and reasonable doubt." *Coffin* v. *Ogden*, 18 Wall. 120; *Campbell* v. *Mayor, etc.*, 20 Blatchf. 67; S. C. 9 Fed. Rep. 500; *Hawes* v. *Antisdel*, 8 O. G. 685; *American Bell Telephone Co.* v. *People's Telephone Co.*, 22 Fed. Rep. 309.

As to the Rogers and Robinson stoves, the proof rests wholly in the recollection of persons who claim to have seen or used these stoves about 20 years before they testified. They do not produce the stoves, nor show that more than one of each kind was ever made; so that, aside from the unsatisfactory nature of testimony resting in the "slippery memory of men" for 20 years or over, these instances of use may properly be classed as abandoned experiments. At all events,

such testimony seems to me too unreliable to form a safe basis for judicial action. The time fixed by the testimony as to the use of these Rogers and Robinson stoves was in the very infancy of the efforts to utilize coal-oil as a cooking fuel, and it seems to me improbable that a man who had made a stove so nearly perfect, and adapted to meet a want which the inventors of that day were endeavoring to supply, would have stopped with the production of a single stove. Especially is this applicable to Robinson, who says in his testimony that he is an experimenter and inventor in the field of oil stoves and heaters.

The "Condon" and "Stevens & Thorpe" stoves are involved in a much larger and more contradictory mass of testimony than the two just considered, and the question is, does the proof in regard to these show a public use or sale of either of these stoves for more than two years before the Mitchell patent was applied for?

*First,* as to the Condon stove. Michael Condon testifies, in substance, that he was foreman in the jobbing department of Cross, Dane & Westlake's factory, in Chicago, in 1865; that W. B. Billings was there experimenting with oil-stoves; and that, under Billings' direction, he constructed a chimney section for an oil-stove like Exhibit Condon, and that subsequently, and during the year 1865, he made chimney sections with cast-iron top and bottom plates holding the chimneys between them by a rod like the defendant's Exhibit Thorpe & Stevens Stove; and the testimony of Condon is to some extent corroborated by the testimony of the witnesses Dane, Sargent, Strathern, McGuire, and Weinberg. It will be noticed that all these witnesses testify only from recollection, and the Condon Exhibit is simply produced by him from recollection, and is but an illustration of what he thinks he remembers having produced under Billings' direction at the time mentioned; and while they say in a general way that these stoves were on exhibition at the Sanitary Fair held in Chicago in June, 1865, and were sold there and at the factory, none of them know of any sales being made, and none of them ever sold any, and no purchaser is produced who bought and used one or more of them; and I think the better, and in fact only reasonable, conclusion is that all that Condon did was in the way of aiding Billings in his experiments, and that no stoves for sale or use were made at Cross, Dane & Westlake's factory in 1865 with chimney sections like the Thorpe & Stevens Chimney Section Exhibit, or the Condon Exhibit; and my reasons for so concluding are, briefly, these: Billings was an inventor of a coal-oil stove which was covered by his patent of January 17, 1865, and which he called "The Union Oil-stove." In the latter part of the winter or early spring of 1865, he made an arrangement with Cross, Dane & Westlake to make these stoves under a license from him, and he had general supervision of the work in the factory on those stoves. This was an oil-stove without a chimney, and was the stove which Billings exhibited at the Sanitary Fair. At some time

after he came there, Billings began experiments with a chimney stove, and finally, in the fall of the year 1865, he constructed what he called his "Tripod Stove," which, as near as I can gather from his description, was made with chimneys suspended in what he calls a "diaphragm," which was a sheet-metal plate holding the chimneys by the top or upper ends, and this diaphragm was held inside a ring, to which three legs were attached, so as to set the frame or tripod over the lamp, and bring the chimneys over the burners. That Mr. Condon, under Billings' direction, made some experimental structure, and possibly something like the Condon Exhibit, may be true; but I am satisfied they were only mere experiments, for the reason that Billings was an inventor. He had already had one stove covered by a patent, and Cross, Dane & Westlake were working under a license to use that patent by a contract with Billings, and were manufacturing stoves in accordance with it for sale upon the market; but Billings was seeking also an improvement upon what he had already done, and the proof shows that in November of the year 1865 he obtained another patent for an oil-stove with no chimney; and it is not reasonable to suppose that if he had, during the summer of 1865, brought his experiments with a chimney stove to a successful result, or had made chimney sections with top and bottom plates like the Condon or Stevens & Thorpe Exhibits, he would not have also covered, or at least sought to cover, this device by a patent. That Cross, Dane & Westlake made, during the early part of the year 1865, a large number of the Union oil-stoves is undoubtedly true; but in the light of the testimony, especially that connected with the sale of their entire stock of oil-stoves in October, 1865, to the Kerosene Lamp Heater Company of New York, I am satisfied that they never made for sale any oil-stove like the Stevens & Thorpe Exhibit or the Condon Exhibit; but if anything approximating in form or construction to either of those exhibits was made by Mr. Condon, under Billings' direction, they were mere experiments, and were not considered as completed, nor put into use. And this conclusion is confirmed by the fact that, in the large stock of oil-stoves and fixtures sold and delivered by Cross, Dane & Westlake to the Kerosene Lamp Heater Company, no device like the Thorp & Stevens Chimney or the Condon Exhibit or the Tripod Stoves were found, which justifies me, I think, in holding that whatever devices in the direction of a chimney stove were made in the year 1865 at Cross, Dane & Westlake's, were taken possession of and retained by Billings as his special property, and considered by him as mere experiments, and were not considered a part of the manufactures of the firm.

I have no reason to assume that Dane, Condon, and the other witnesses who testified as to what was done in 1865 have intentionally testified falsely as to the facts stated in their depositions. I think they are mistaken as to the time when they first saw the chimney sections with top and bottom plates holding chimneys between

them. The subject of improvements in oil-stoves was undoubtedly a topic of interested discussion among the workmen in the shop where so much of that kind of work had been done as was done at Cross, Dane & Westlake's in the spring and summer of 1865, and when the Stevens & Thorpe chimney section was produced at a later date, they probably saw it; and as these men knew Stevens, and were naturally interested to examine and remember what he had accomplished, they have by the lapse of time become confused as to dates. Billings states unequivocally that he never saw a chimney section like the Stevens & Thorpe Exhibit until it was shown him by Stevens in 1866; and when we bear in mind that he was, of all these witnesses, the one most interested in improvements in this class of devices, I think his recollection is much more reliable than that of Condon and Dane as to when such chimney sections were first seen in Cross, Dane & Westlake's shop. It is no reflection on these men's truthfulness when I say I am satisfied they did not see a chimney section like the Thorpe & Stevens Exhibit until after Stevens had made one in the fall of 1866 or spring of 1867, as it is so easy for men to be mistaken as to dates. Inventors like Billings are not in the habit of conceding to others devices which they themselves originate, and it is absurd to assume that if Billings had produced a chimney section like the Stevens & Thorpe Exhibit, in 1865, he would have conceded it to be Stevens' invention, as he does in his testimony. The most that Billings says he did was to produce a Tripod stove, and he lays no claim to the "Stevens & Thorpe" chimney section, but says directly and expressly that Stevens did that.

I now come to consider the testimony relating to what was done by Stevens & Thorpe and Parke in the way of producing an oil-stove, substantially like that covered by Mitchell's patent, prior to August, 1867. It appears from the proof that the relation between Billings and Cross, Dane & Westlake, in the construction of oil-stoves, closed in the fall of 1865, when the latter firm sold out their stock of oil-stoves to the Kerosene Lamp Heater Company; but, for more than a year afterwards, Billings seems to have been actively engaged in some other shop or place of business in selling rights to use his patents, and in making improvements upon oil-stoves. At some time, apparently after he closed his connection with Cross, Dane & Westlake, he entered into some contract or relation with James H. Thorpe and a Mr. Parke, the son-in-law of Thorpe, by which Thorpe and Parke were to sell territorial rights to make, sell, and use oil-stoves under Billings' patents; and I think it is fairly deducible from the evidence that the idea of adding a chimney to the Billings device was acted upon either by Billings himself, or by him and Thorpe and Parke together, and in the fall of 1866 this purpose took a practical shape by the employment of Stevens, who was then working at Baldwin's shop at 210 Lake street, to make some chimney sections. I think there can be no doubt from the proof that Stevens did some

work on this device in August or September, 1866, while at Baldwin's, and that their experiments in that direction were continued in the spring of 1867, after Stevens had gone into the employment of B. L. & O. S. Chamberlain; and the result of what was done by Stevens under the direction of Billings, Thorpe, and Parke in the fall of 1866, and the spring and summer of 1867, was the production of a stove substantially like the Stevens & Thorpe Exhibit. Billings says that he sold out his entire interest in his patent and the oil-stove business in the spring of 1867, and I think it may be assumed from the proof that the idea of inclosing the chimneys in a drum, and filling the drum with plaster of paris, was quite fully worked out and put in a practical form in the early summer of 1867; for in June, 1867, an order was given the firm of Ingalls, Sylla & Perkins, of Elgin, for a lot of castings for what would seem to be about 100 completed stoves of the style shown as the Seymour Exhibit; and about the tenth of September, 1867, Thorpe appeared at the Scott county fair held at Davenport, Iowa, with two stoves, one like the Seymour Exhibit and one like the Butler Exhibit, and these stoves were used and exhibited by Thorpe at this fair, and afterwards used by Seymour in Davenport. My conclusion from the testimony of Stevens is that he made no stoves to be put on the market and sold by Thorpe and Parke or by Billings, but that the object was to get up a stove which would enable them to sell territorial rights under the Billings patents, and perhaps under other patents which they contemplated obtaining. Stevens says repeatedly, in the course of his testimony, that the parties were experimenting; for instance, at page 125, vol. 1, Defendant's Record, he says:

"The stoves made, varied in construction at different times; in other words, we were experimenting a part of the time. *C. Q.* 59. Who do you mean by 'we'? *A.* I refer to Billings, Thorpe, Parke, and myself; more especially to Thorpe and myself."

It seems quite palpable to me, from the evidence of Mr. Stevens, that himself, Thorpe, and Parke were at work, through the summer of 1867, getting up an elaborate stove like the Seymour Exhibit, not for the purpose of putting it on sale as a common article of merchandise, but as an illustration or sample stove for the purpose of enabling them to sell territorial rights. What they wanted, and were evidently seeking to obtain, was an attractive oil-stove that would, at least, appear to be useful and practicable, and which would make their patent salable.

There is no proof in the record showing, or pretending to show, that Billings, Stevens, Thorpe, or Parke sold a stove, or had one in public use, like the Seymour or Butler Exhibits, during the spring or summer of 1867. I conclude from the proof that the first public exhibition they made of this stove was at the Davenport fair, in September, 1867. The case as made in the proofs is to my mind a clear one of different inventors, working contemporaneously at the same de-

vice, and arriving at substantially the same results at nearly the same time. Mitchell testifies that he had his device fully perfected, as covered by his patent, in the spring of 1867, having begun his experiments in the spring or early part of 1865, but was too poor to apply at that time for his patent, and did not do so until August, 1869. Stevens, Thorpe, and Parke, perhaps, with some suggestions from Billings, began in the same line of experiments in the fall of 1866, and got their stove out ready to place before the public in the month of September, 1867; but, as already said, I find no proof in the record that they put their device, as shown in the Seymour and Butler Exhibits, into public use or on sale, or that they can be said to have brought their experiments to a successful result, until the month of September, 1867, at which time Mitchell had applied for his patent. Thorpe and Parke did not intend to go into the manufacture or sale of oil-stoves. All they wanted was a few stoves to exhibit to help them sell rights, and hence it is not probable that they would offer stoves for sale, except in exploiting their patents, and in connection with efforts to sell territorial rights. Thorpe is described in the evidence as a dealer in patent-rights, and it was undoubtedly to aid him in this business, and not as a manufacturer or vendor of oil-stoves, that the stoves made by Stevens were got up. Therefore, while, as I have said, the testimony is unusually conflicting and contradictory, I have had no difficulty, after a careful study and analysis of it, in finding that the proof does not defeat this patent by showing that the device covered by it was in public use and on sale for more than two years before the Mitchell patent was applied for.

As to the question of infringement. There can be no doubt from a mere inspection of the defendant's stoves, which are stipulated in the case as exhibits, that they have the construction called for and covered by the first claim of the Mitchell patent. They have the top and bottom plates, with the chimneys held between them. Although they also have a drum or casing surrounding the chimney, that is a mere addition, and does not change the combination shown in Mitchell's patent.

I think the proof shows that devices for holding cooking utensils above the tops of the chimneys had been in use before the commencement of Mitchell's experiments in 1865, and I must therefore hold that the second claim of the patent for projections, O, on the upper surface of the plate, K, must be limited to projections cast or raised upon the surface of the plate, K, or cast as a part of the upper plate itself; and within this limitation I think that, under the proof, this claim may be sustained; and none of the defendant's stoves show the use of these projections constructed and applied substantially as described in the patent. I therefore find that the patent is valid, and that the defendants infringe the first claim thereof, and that complainant is entitled to an accounting for profits and damages.